[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 29, 2002
THOMAS K. KAHN
CLERK

No. 01-13027

D.C. Docket No. 98-00463 CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

REYNALDO MIRAVALLES, JR.,
a.k.a. Reynaldo Miravalles,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 29, 2002)**

Before CARNES, BARKETT and KRAVITCH, Circuit Judges.

CARNES, Circuit Judge:

Reynaldo Miravalles, Jr. appeals his conviction for trafficking and attempting to traffic in cigars bearing counterfeit marks, in violation of 18 U.S.C. § 2320. He contends that the district court erred in denying his motion to suppress evidence of counterfeit cigar labels obtained because law enforcement officers were present in the common areas of his apartment building. The facts of the case present us with an issue of first impression in this circuit: whether the tenants of a large, multi-unit apartment building have a reasonable expectation of privacy in the common areas of the building. We hold that they do not, at least where the lock on the door of the building is not functioning and anyone may enter.

The case began when several law enforcement officers, including agents of the United States Secret Service and members of the Metro-Dade Police Department, gathered in a parking lot adjacent to the apartment building where Miravalles resided with his wife and daughter. The officers believed, based on a tip from a confidential informant, that cigars with counterfeit labels [1] were located in his apartment, but they did not have sufficient probable cause to obtain a search

---

[1] In the briefs and in testimony, the parties and the witnesses referred interchangeably to "counterfeit labels" and "counterfeit cigars." The latter term is inaccurate, because there was nothing counterfeit about the cigars themselves; they were real cigars. Only the labels were counterfeit, which is the defining element of the crime of trafficking in cigars bearing counterfeit marks.

warrant.

Hoping to develop probable cause, the officers entered the large high-rise apartment building through the glass front door.  They did not notify the property manager before entering and did not have to in order to gain entry, because the door was unlocked.  Though designed to be locked and function with an electronic card mechanism, the door was on occasion unlocked when the electronic system was not working.[2]  The day the officers entered the  building was such an occasion.  Once inside, the officers got on the elevator and rode  up to the fourteenth floor where Miravalles' apartment,  No. 1414,  was located.

The officers knocked and Miravalles' father answered the door.  They told him they were conducting an investigation, but he refused to consent to a search of the apartment.  As the officers were speaking to the father, Miravalles' wife approached the apartment.  Hoping that she would be more cooperative, the officers asked her for permission to search the apartment.  Their hopes were not realized.  She  refused to give consent to the search  and told the officers to leave if they did not have a warrant.  At that point, one of the officers looked into the open door and told Miravalles' wife that he could see what appeared to be boxes of

---

[2]  When operational, the lock, and therefore the door, would open only when an authorized electronic card was inserted into the lock unit or when an occupant pressed a buzzer releasing the lock.

Cuban cigars and that they could be counterfeit. In response to the officer's request to bring him a cigar, Miravalles' wife retrieved one, which had no label, and gave it to the officer.

Most of the officers then left and went downstairs, but at least one remained behind on the fourteenth floor and hid in the hallway near the apartment. He did not have to hide long before he saw Miravalles' wife come out of the apartment with a garbage bag, which she threw in a chute used by the tenants on that floor to send trash to the ground floor for disposal. Immediately thereafter, she went back to the apartment and came out again with a second bag, through which the officer could see what appeared to be counterfeit cigar labels, and she threw that bag into the chute, too. The officers then retrieved the two bags from the garbage bin on the ground floor and verified that they contained counterfeit cigar labels.

After retrieving those counterfeit labels, the officers decided they had probable cause to arrest the occupants of the apartment, and went back up to the fourteenth floor. They knocked on the door of the apartment, but this time there was no answer. They continued to knock for several minutes and yelled for the occupants to respond. As the officers were preparing to enter by force, the property manager who was responding to the commotion arrived at the apartment and opened the door for the officers using her master key. They entered and

4

arrested Miravalles' father and wife.  Miravalles was not there.  The officers observed in plain view throughout the apartment  boxes of  cigars and counterfeit labels and seized them.

Based on the evidence obtained from the two bags Miravalles' wife threw away and the evidence seized during the search of the apartment, a grand jury returned an indictment against Miravalles, charging him with trafficking in, and attempting to traffic in, cigars bearing counterfeit marks, in violation of 18 U.S.C. § 2320.[3]  Miravalles filed a motion to suppress the evidence, contending that it had been seized as a result of the officers trespassing in the apartment building and an illegal search of his apartment.

After conducting an evidentiary hearing on the motion to suppress, a magistrate judge issued a report and recommendation concluding that tenants have an expectation of privacy in the common areas of their multi-unit apartment buildings, which the officers had violated when they entered Miravalles' apartment building without permission.  After the government filed objections, the district court, while adopting the recommendation and report's findings of fact, disagreed with its legal conclusions about whether there was a reasonable expectation of

---

[3]We note for the benefit of any cigar afficionados who may read this opinion that the indictment charged that the  phony labels displayed the names and marks of "Fuente Fuente Opus X," "Cohiba," "Punch," and "Partagas."

privacy in the common areas of the apartment building. The district court held that there was none, and therefore the search and seizure that resulted from the officers being in the building was not unconstitutional.

After that ruling, Miravalles pleaded guilty to one of the counts of the indictment in return for the dismissal of the other three counts. He made his guilty plea pursuant to Fed. R. Crim. P. 11(a)(2), reserving a right to appeal the district court's denial of his motion to suppress the evidence. The district court accepted Miravalles' plea and adjudged him guilty, sentencing him to three years of probation and ordering him to pay a special assessment of $100. This is Miravalles' appeal, which challenges the denial of his motion to suppress. [4]

---

[4] In his motion to suppress, Miravalles had also contended that evidence seized from his apartment pursuant to a search warrant on a later date should have been suppressed. That part of the motion to suppress was also denied, but Miravalles did not reserve his right to appeal it and has not attempted to do so.

Miravalles did preserve for appeal and now presses his contention that even if he had no reasonable expectation of privacy in the common areas of the apartment building, the evidence obtained in the warrantless search of his apartment on this occasion should have been suppressed. The government argues that it was justified by exigent circumstances. We agree. Exigent circumstances justifying a warrantless entry into a place of residence exist where facts would lead a reasonable officer to believe that evidence of a crime is in danger of imminent destruction. See Cupp v. Murphy, 412 U.S. 291, 294-95, 93 S.Ct. 2000, 2003-04 (1973). When Miravalles' wife took the bags of trash containing counterfeit cigar labels out of her apartment and threw them into the trash chute, and then refused to come to her apartment door in response to the officers' knocks and demands, it was reasonable for the officers to believe that relevant evidence, including paper cigar labels, was in imminent danger of destruction by the apartment's occupants. See generally United States v. Young, 909 F.2d 442, 444-46 (11th Cir. 1990) (exigent circumstance justified officer's warrantless seizure of cash, spiral notebooks, phone number lists, and various papers, items that easily could have been destroyed quickly).

A person has an expectation of privacy protected by the Fourth Amendment if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable.  See Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516 (1967) (Harlan, J., concurring).  We have never spoken directly to the issue  presented in this case, but a number of other circuits have. Five of the six circuits that have decided the issue have concluded that tenants do not have a reasonable expectation of privacy in the common areas of their apartment building. Of those five decisions, four necessarily suggest that it does not matter whether the door to the apartment building is locked or unlocked at the time law enforcement officers arrive, because in each of those cases the  door was locked.  See  United States v. Nohara, 3 F.3d 1239, 1241-42 (9th Cir. 1993) (apartment hallway); United States v. Concepcion, 942 F.2d 1170, 1171-72 (7th Cir. 1991) (apartment common areas); United States v. Barrios-Moriera, 872 F.2d 12, 14-15 (2d Cir. 1989) (apartment hallway), overruled on other grounds by Horton v. Cal., 496 U.S. 128, 110 S.Ct. 2301 (1990); United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (apartment hallway).  It is not clear which position the other of those five circuits, the First Circuit, would take on locked door facts,  but it has held there is no reasonable expectation of privacy in an apartment building's apparently unlocked parking garage.  See United States v. Cruz Pagan, 537 F.2d

7

554, 558 (1ˢᵗ Cir. 1976). The only circuit that has recognized a reasonable expectation of privacy in the common areas of an apartment building, at least when the door is locked, is the Sixth Circuit. See United States v. Carriger, 541 F.2d 545, 550 (6ᵗʰ Cir. 1976) (apartment common areas).

The five circuits holding that there is no reasonable expectation of privacy in the common areas of an apartment building reason that tenants have little control over those areas, which are available for the use of other tenants, friends and visitors of other tenants, the landlord, delivery people, repair workers, sales people, postal carriers and the like. See Nohara, 3 F.3d at 1242; Concepcion, 942 F.2d at 1172; Eisler, 567 at 816; Cruz Pagan, 537 F.2d at 558. The reasonableness of a tenant's privacy expectation in the common areas of a multi-unit apartment building stands in contrast to that of a homeowner regarding the home and its surrounding area, over which the homeowner exercises greater control. See Barrios-Moriera, 872 F.2d at 14; Cruz Pagan, 537 F.2d at 558. The more units in the apartment building, the larger the number of tenants and visitors, workers, delivery people, and others who will have regular access to the common areas, and the less reasonable any expectation of privacy. Whether the door to the building is locked is another relevant consideration.

The Sixth Circuit stands alone in taking the position that it is reasonable for

8

tenants to expect privacy in the common areas of their apartment building, at least when the building is locked. Its reasoning is that while tenants living in a locked building may expect that other tenants or their guests will be in the common areas, it is also reasonable for them to expect that the general public or trespassers (including law enforcement officers) will be excluded. See Carriger, 541 F.2d at 551-52. The Sixth Circuit decision is a quarter of a century old.

The closest this court has come to deciding whether tenants have a reasonable expectation of privacy in the common areas of apartment buildings is Fixel v. Wainwright, 492 F.2d 480 (5th Cir. 1974).[5] In that case we held that tenants in a four-unit apartment building had a reasonable expectation of privacy in their fenced backyard. Id. at 483. We also noted, however, that the fenced yard at issue there was "not a common passageway normally used by the building's tenants for gaining access to the apartments. Nor [was] [it] an area open as a corridor to salesmen or other businessmen who might approach the tenants in the course of their trade." Id. at 484 (internal citations omitted). We pointed out that the backyard was "not as public or shared as the corridors, yards or other common areas of a large apartment complex...." Id. In short, we were careful to leave open

_____

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

9

in <u>Fixel</u> the issue we now decide.

We decide cases based upon their specific facts. On a motion to suppress, the defendant bears the burden of proving facts that demonstrate the reasonableness of his expectation of privacy in the searched area. <u>See</u> <u>United States v. Cooper</u>, 203 F.3d 1279, 1284 (11th Cir. 2000); <u>United States v. Ramos</u>, 12 F.3d 1019, 1023 (11th Cir. 1994). The facts that were established at the motion to suppress hearing or conceded thereafter are that the apartment searched was in a multi-unit high-rise building with at least fourteen floors, and the electronic lock on the front door at times did not work and was not working when the officers arrived. Therefore, the only issue before us is whether tenants in a large, high-rise apartment building, the front door of which has an undependable lock that was inoperable on the day in question, have a reasonable expectation of privacy in the common areas of their building. Our answer is no.

On the day of the search, the lobby of this apartment building and the hallways and other common areas of it were open and accessible not only to all the many tenants and their visitors, to the landlord and all its employees, to workers of various types, and to delivery people of all kinds, but also to the public at large. There was nothing to prevent anyone and everyone who wanted to do so from walking in the unlocked door and wandering freely about the premises. Under

these circumstances, any expectation of privacy in the common areas of the building was not only unreasonable, but foolhardy.

**AFFIRMED.**